1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

STACY BUTLER, an individual, DARRYL BRADSHAW, an individual, CLIFTON CUNNINGHAM, an individual, EDRIC JORDAN, an individual, KEVIN STANDARD, an individual, and KYLE WINTERS, an individual,

Plaintiffs,

vs.

SAN DIEGO DISTRICT ATTORNEYS OFFICE, a municipal sub-agency of the COUNTY OF SAN DIEGO, COUNTY OF SAN DIEGO, a municipal corporation, KEITH BURT, an individual, EDWARD CERVANTES, an individual, SAN DIEGO POLICE DEPARTMENT, a municipal sub-agency of the CITY OF SAN DIEGO, CITY OF SAN DIEGO, a municipal corporation, JIM KELLY, an individual, WILLIE CHARLES GODINE, an individual, DARIN PALMER, an individual and DOES 1-100,

Defendants.

CASE NO. 01cv2087 BTM(JMA)

**ORDER GRANTING BURT AND COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, GRANTING CERVANTES' MOTION FOR SUMMARY JUDGMENT, GRANTING IN PART AND DENYING IN PART KELLY AND CITY OF SAN DIEGO'S MOTION FOR SUMMARY JUDGMENT, AND DISMISSING CLAIMS AGAINST PALMER; AND ORDER TO SHOW CAUSE WHY CASE SHOULD NOT BE DISMISSED AS TO GODINE**

26
27
28

Pending before the Court are three motions for summary judgment filed by (1) Defendants County of San Diego (also sued as San Diego District Attorney's Office) and Keith Burt; (2) Edward Cervantes; and (3) City of San Diego and Jim Kelly. For the reasons

discussed below, the motion filed by the County Defendants and Burt is **GRANTED**, the motion filed by Cervantes is **GRANTED**, and the motion filed by the City of San Diego and Kelly is **GRANTED IN PART AND DENIED IN PART**.

# I. BACKGROUND

A.    Overview of Case

In 1988, San Diego Police Officer Jerry Hartless was shot and killed while pursuing a fleeing suspect.

In 1991, Plaintiff Stacy Butler was tried for the murder of Hartless.  The trial ended in a mistrial after the jury deadlocked 6-6.

In 1993-1994, Butler, Darryl Bradshaw, Clifton Cunningham, Edric Jordan, Kevin Standard, and Kyle Winters,  were tried for the felony-murder of Hartless.  Darin Palmer was an important witness who testified on behalf of the prosecution.  Butler, Cunningham, and Standard were convicted of conspiracy to commit murder and murder, Bradshaw was convicted of conspiracy, Winters pled guilty to a lesser charge (after the jury deadlocked as to him), and Jordan was acquitted.  Butler was sentenced to 31 years to life, Bradshaw was sentenced to 25 years to life, Standard was sentenced to 26 years to life, Cunningham was sentenced to 36 years to life, and Winters was sentenced to 11 years.

In 1997, the San Diego Union-Tribune ran a story revealing that while Darin Palmer was a cooperating witness, he was allowed to have sexual trysts with his wife and encounters with other women in the San Diego District Attorney's Office.  The article also revealed that the Palmers had taken 13 polaroid photographs "depict[ing] graphic, sexual poses of each of [them] against such backdrops in the prosecutor offices as law books, a deputy sheriff's uniform and an investigator's nameplate."

Subsequently, the five convicted defendants filed habeas corpus petitions in state court.  Judge William Kennedy, who had presided over both of the prior trials, was appointed as a special referee by the California Court of Appeal.  After conducting a three-month hearing, Judge Kennedy issued his recommendation that all of the convictions be overturned.

In an order filed on July 20, 1999, the Court of Appeal adopted Judge Kennedy's findings, overturned the convictions, and remanded the case for a third trial.

Prior to the third trial, Judge Kennedy disqualified the District Attorney's Office from retrying the case, and the Attorney General's Office took over the prosecution. After reviewing the file, the Attorney General offered a plea bargain. The convicted defendants agreed to plead guilty to voluntary manslaughter in exchange for time served.

On August 15, 2001, Plaintiffs commenced this action.

B.   <u>Allegations of the First Amended Complaint</u>

The following facts are alleged in the First Amended Complaint ("FAC"). The Court makes no findings regarding the truthfulness of the allegations.

On January 9, 1988, shortly after midnight, Officer Hartless was shot and killed while chasing a black man with a green jacket. (FAC, ¶ 14.) Police officers immediately went to a nearby house on La Paz Drive where black neighborhood youths sometimes stayed. (FAC, ¶ 16.) Butler, Palmer and a man named Hollis were inside the house and were handcuffed. (FAC, ¶ 18.) Also in the house was a black man in a green jacket who identified himself as "Lonnie Gene Fuller." (FAC, ¶ 19.) However, police knew that Lonnie Gene Fuller had been shot and killed two years earlier. (<u>Id.</u>) A woman at the La Paz house identified the man as Willie Charles Godine. (FAC, ¶ 20.) Godine was the brother of veteran San Diego Police Detective Jim Kelly. (FAC, ¶ 21.)

The police called Kelly and told them about Godine's possible involvement in the shooting of Hartless. (FAC, ¶ 22.) The police let Godine leave the scene to meet with Kelly at their mother's house. (<u>Id.</u>)

In the La Paz house, the police found a green and white New York Jets sweatshirt, which Butler admitted was his. (FAC, ¶ 23.) The police told Butler to put the sweatshirt on and placed him in a curbside line-up. (<u>Id.</u>) Officer Schneider, Hartless' partner, told the officers that Butler's shirt had too much white on it and that Butler "had too much meat on him." (<u>Id.</u>)

3

At sunrise, K-9 supervisor Sergeant Tom Payne and his dog conducted a search of the backyard which was dominated by one large lemon tree. (FAC, ¶ 24.) Nothing was found. Immediately thereafter, Kelly called his superiors and reported that Godine told him that the murder weapon was under the lemon tree in the backyard. (FAC, ¶ 25.) Another search was conducted by K-9 Officer Pete Mills and a dog who was specifically trained to detect explosives and gun powder. (FAC, ¶ 26.) Again, nothing was found. (Id.)

An hour later, Kelly and Godine entered the backyard. (FAC, ¶ 28.) Kelly walked a straight path to the lemon tree, squatted down, and stood up with a .22 caliber and a .38 caliber revolver. (Id.) The guns had been thoroughly cleaned of all prints. (Id.) The .22 caliber revolver turned out to be the murder weapon. (Id.) The revolver was owned by Palmer. (FAC, ¶ 30.) Investigators found a prescription pill bottle belonging to Palmer which contained .22 caliber bullets. (Id.)

After the guns were found, Kelly told his superiors that Godine told him that Butler came up to Godine shortly before the police officers entered the La Paz house, handed him the guns, and said "hide these." (FAC, ¶ 31.) Godine told Kelly that he threw both guns under the lemon tree in the backyard. (Id.) When asked by his superiors why he did not reveal this information previously, Kelly said that "it slipped my mind." (Id.) However, Lisa Johnson, Godine's female companion who Godine said was three feet away from him when Butler asked him to get rid of the guns, told detectives that she did not see or hear anything to do with guns. (FAC, ¶ 32.)

When Payne heard how easily Kelly and Godine found the guns under the lemon tree, Payne told Deputy District Attorney Burt, Cervantes (an investigator with the District Attorney's Office), and a San Diego Police detective, "You've got problems with your evidence." (FAC, ¶ 33.) To prove that the K-9 units could not have missed the guns, Payne performed a "dog test" for Burt and Cervantes. (FAC, ¶ 34.) The dog found a gun hidden near the lemon tree within 30 seconds. (Id.)

Another District Attorney Investigator working for Burt took a statement from the only eye witness to the shooting. (FAC, ¶ 35.) This witness (identified as "Samaritan" in files of

01cv2087 BTM(JMA)

the District Attorney's Office) stated that Hartless was shot by a Los Angeles gang member. (Id.)

The District Attorney's Office allegedly proceeded against Butler even though it had become clear that Butler was innocent. (FAC, ¶ 36.) Cervantes told Palmer that he would be prosecuted for the murder of Hartless unless he agreed to cooperate with the District Attorney in the case against Butler. (FAC, ¶ 36.) Palmer agreed to cooperate. (Id.) Burt intentionally concealed the identity and statement of the "Samaritan" and concealed the facts concerning the "dog test." (FAC, ¶ 37.) Burt sought the ultimate penalty of death against Butler. (Id.)

After the mistrial, Burt and Cervantes concocted a new theory of the case in which Plaintiffs conspired to kill a rival gang member and killed Hartless in the course of carrying out the conspiracy. (FAC, ¶ 39.) Burt and Cervantes allegedly approached Palmer about making up a story consistent with the new conspiracy theory. (FAC, ¶ 43.) At this time, Palmer was in jail awaiting trial for armed robbery and faced a potential 25 year sentence. (FAC, ¶ 41.)

Palmer allegedly entered into a secret agreement with Burt and Cervantes. (FAC, ¶ 44.) Under this agreement, Palmer would lie for the prosecution. (Id.) In exchange, Palmer would get "time served" for the robbery charge and would not get prosecuted for the murder of Hartless. (Id.) In addition, Palmer was promised superior conditions of confinement, phone use, sex with women, fast food and alcohol. (Id.)

Burt requested that Victor Nunez be assigned to the Palmer robbery case to make it look like Burt had no involvement in the case. (FAC, ¶ 46.) Burt directed Nunez to continue Palmer's sentencing on the robbery charge until after Palmer testified at the second trial. (FAC, ¶ 46.)

In accordance with the agreement, Palmer was transferred to a unit in South Bay which consisted of adjoining cells with beds and a day-room with a television, telephone, table and chairs. (FAC, ¶ 47.) Palmer could shower any time of day and had unlimited access to the television and telephones. (Id.) The District Attorney's Office paid for Palmer's phone use in the amount of $5,685.05. (FAC, ¶ 49.)

Cervantes frequently took Palmer for "field trips" to the District Attorney's Office. (FAC, ¶ 50.)  During these trips, Cervantes would buy Palmer fast food and provide him with alcohol.  (Id.)   Burt and Cervantes also allowed Palmer's wife and other women to visit Palmer at the District Attorney's Office.  (FAC, ¶¶ 51, 53, 56.)  Burt and Cervantes let Palmer have sex with his wife and another woman, Kathy Hilliard, in the District Attorney's Office. (FAC, ¶ 51, 53.)  Cervantes let the Palmers use a camera and film belonging to the District Attorney's Office to take pictures of themselves naked and engaging in sexual relations in the District Attorney's Office.  (FAC, ¶ 52.)

At trial, Burt tried to hide the "dog test" evidence, but Sergeant Payne testified as a defense witness.  (FAC, ¶ 58.)  Burt successfully hid the evidence of "Samaritan."  (Id.) Palmer gave false testimony in support of the prosecution's felony-murder theory.  (FAC, ¶ 59.)  He also testified that he received no benefit of any kind from the District Attorney in exchange for his testimony and denied having any sort of agreement with the District Attorney with respect to his robbery case.  (FAC, ¶ 60.)  Burt elicited testimony from Nunez that Burt had nothing to do with Palmer's robbery case.

Several months after the second trial concluded in guilty verdicts for Butler, Cunningham, Standard, and Bradshaw, Palmer was sentenced to time served and was released.  (FAC, ¶ 65.)

The FAC alleges the following twenty-one causes of action: (1) Civil Rights Violations under California Civil Code § 51.7; (2) Conspiracy to Violate California Civil Code § 51.7; (3) Civil Rights Violations under California Civil Code § 52.1; (4) Conspiracy to Violate California Civil Code § 52.1; (5) False Arrest/Imprisonment under 42 U.S.C. § 1983; (6) Conspiracy to Commit False Arrest and Imprisonment under 42 U.S.C. § 1983; (7) Framing under 42 U.S.C. § 1983; (8) Conspiracy to Frame under 42 U.S.C. § 1983; (9) Conspiracy to Obstruct Justice under 42 U.S.C. § 1985; (10) Refusal or Neglect to Prevent a Conspiracy under 42 U.S.C. § 1986; (11) -(16) RICO Violations and Conspiracy to Commit RICO Violations under 18 U.S.C. § 1962; (17) Common Law False Arrest/Imprisonment; (18) Common Law Abuse of Process; (19) Common Law Intentional Infliction of Emotional Distress; (20) Common Law

Negligent Infliction of Emotional Distress; and (21) Common Law Negligence.

C.    Procedural History

On August 15, 2001, Plaintiffs commenced this action.  On November 16, 2001, Defendants filed a motion to dismiss, which was granted in part and denied in part.  On March 8, 2002, Plaintiffs filed the FAC, which alleged the same causes of action as the original complaint.

On July 8, 2002, Burt moved for summary judgment on the federal claims and Cervantes moved for summary judgment on the federal and state claims.  In an order filed on November 12, 2002, Judge Keep denied in part and granted in part the motions for summary judgment.  The Court granted the motions to the extent that Plaintiffs' federal claims against Burt and Cervantes were founded upon the "dog test" evidence or Defendants' actions in connection with the charging and prosecution of Plaintiffs on the "conspiracy theory."  The Court denied the motions to the extent that Plaintiffs' federal claims were based on the "eyewitness Samaritan," or "special treatment of Palmer."  The Court also denied Cervantes' motion for summary judgment as to the state causes of action.

On December 6, 2002, Burt and Cervantes appealed the partial denial of their motions.

On January 16, 2004, the parties stipulated to dismiss the RICO claims (eleventh through sixteenth causes of action) with prejudice.

In a decision filed on June 4, 2004, the Ninth Circuit vacated the portion of the November 12, 2002 order from which Burt and Cervantes appealed and remanded the case. The reason for the remand was that in ruling upon the motions for summary judgment, the Court "incorrectly understood the law to require it to assume that factual allegations in a plaintiff's § 1983 complaint are true when a defendant moves for summary judgment based on official immunity."  Butler v. San Diego District Attorney's Office, 370 F.3d 956 (9th Cir. 2004).  The Ninth Circuit acknowledged that there was confusion in the case law regarding the proper evidentiary standard for deciding a motion for summary judgment by a defendant

based on official immunity, and clarified that "a district court is not required (or even allowed) to assume that challenged factual allegations in a plaintiff's complaint are true, irrespective of any evidentiary support, if a defendant makes a properly supported motion for summary judgment based on official immunity that would, on a motion for summary judgment in any other civil case, require plaintiff to produce evidence in opposition." Butler, 370 F.3d at 964.

## II. DISCUSSION

A. Burt and Cervantes

### 1. Federal Claims

Plaintiffs allege that Burt and Cervantes violated their constitutional rights by framing them for the murder of Hartless.  Specifically, Plaintiffs allege that: (1) Burt and Cervantes suppressed evidence regarding the "dog test" performed by Sergeant Payne; (2) Burt and Cervantes suppressed evidence of the witness "Samaritan"; (3) Burt and Cervantes threatened Palmer with prosecution for the Hartless murder to induce him to give false statements at the investigative stage of the case; (4) Burt and Cervantes entered into an agreement with Palmer to provide him with extraordinary benefits in exchange for false statements during the investigative stage of the case; and (5) Burt coerced Deputy District Attorney Nunez to testify falsely about who was handling the Palmer armed robbery case so that Burt could distance himself from the secret "time served" agreement he had made with Palmer.

#### a. Dog Test Evidence

In the order filed on November 12, 2002, Judge Keep properly granted summary judgment in favor of Burt and Cervantes to the extent that Plaintiffs' federal claims are premised on suppression of the "dog test" evidence.  According to Payne's testimony at the second trial, Burt was informed about the "dog test" prior to the first trial but after Butler was arrested and charged.  (See Plaintiffs' Exh. 8 at 10221 in opposition to Kelly's Motion for Summary Judgment.)  Accordingly, even if Burt and Cervantes suppressed or failed to

8

1   disclose such evidence, their actions were in the course of advocacy and are protected by

2   absolute prosecutorial immunity.  See Imbler v. Pachtman, 424 U.S.  409, 431 (1976)

3   (holding that a prosecutor is absolutely immune from damages for the suppression of

4   evidence during initiation and presentation of the State's case); Broam v. Bogan, 320 F.3d

5   1023, 1030 (9th Cir. 2003) (explaining that a prosecutor is entitled to absolute immunity from

6   a civil suit for damages based on Brady violations).[1]

7       To the extent that Burt and Cervantes allegedly suppressed evidence regarding the

8   dog test during the investigation of the other Plaintiffs, their actions do not support a due

9   process claim.  Burt and Cervantes were not under a duty to disclose exculpatory evidence

10   *before* charges were brought against Plaintiffs.  See Brady, 373 U.S. at 87 (holding that

11   suppression by the prosecution of evidence favorable to an *accused* violates due process).

12

13              b.  Charging and Prosecution under Conspiracy Theory

14       Judge Keep also correctly granted summary judgment in favor of Burt and Cervantes

15   to the extent that Plaintiffs' federal claims were based on Burt's prosecutorial decision to

16   charge and prosecute Plaintiffs under the conspiracy theory.  See Imbler, 424 U.S. at 431;

17   Milstein v. Cooley, 257 F.3d 1004, 1011-12 (9th Cir. 2001).

18

19              c.  Nunez

20       The Court finds that absolute prosecutorial immunity also extends to Burt's alleged

21   coercion of Nunez to provide false testimony at trial regarding who was handling Palmer's

22   armed robbery case.  Even if Burt coerced Nunez to provide false testimony, Burt did so in

23   preparation for trial and in the course of his role as an advocate for the State.  See Buckley

24   v. Fitzsimmons, 509 U.S.  259, 273 (1993).

25

26      [1]  The fact that Cervantes was an "investigator" for the DA's Office as opposed to a
    Deputy District Attorney does not make any difference when determining whether absolute
27   prosecutorial immunity applies.   Prosecutorial immunity depends on "the nature of the
    function performed, not the identity of the actor who performed it."  Kalina v. Fletcher, 522
28   U.S. 118, 127 (1997) (quoting Forrester v. White, 484 U.S. 219, 229 (1988)).  See Genzler
    v. Longanbach, 410 F.3d 630 (2005) (applying same analysis to Deputy District Attorney and
    District Attorney Investigator when determining whether prosecutorial immunity applied).

d.  "Samaratin"

Burt and Cervantes' alleged suppression of evidence regarding "Samaritan" during the investigatory phase of the case does not in and of itself give rise to a constitutional claim. Burt and Cervantes did not have a constitutional duty to disclose exculpatory evidence before charges were brought against Plaintiffs.  However, as discussed below, the alleged evidence regarding "Samaritan" may be pertinent to Plaintiffs' falsification-of-evidence claim.

e.  Falsification of Evidence/Treatment of Palmer

Upon review of the evidence, the Court finds that there is a genuine issue of material fact with respect to whether Burt secretly agreed to get Palmer "time served" in connection with the robbery charge.  The Court also finds that there is a genuine issue of material fact as to whether Cervantes and Burt knowingly provided Palmer with extraordinary benefits including superior conditions of confinement, collect phone calls, and the opportunity to have sex with his wife and other women.  However, the provision of these benefits is not, *in and of itself*, violative of Plaintiffs' constitutional rights.[2]

Plaintiffs claim that the benefits were provided in exchange for Palmer making *false* statements implicating Plaintiffs during the investigative phase prior to the issuance of the second indictment.[3]  Accordingly, the focus of the Court's inquiry is whether Cervantes and Burt engaged in deliberate falsification of evidence.

To establish a deliberate-falsification-of-evidence claim, Plaintiffs must provide

---

[2]  The failure to disclose such benefits to the defense was a Brady violation and was the reason why the convictions were overturned.  However, a prosecutor is absolutely immune from section 1983 damages for Brady violations.  Broam v. Bogan, 320 F.3d 1023, 1030 (9th Cir. 2003).

[3]  If, as Plaintiffs claim, Burt and Cervantes coerced and bribed Palmer to make *false* statements during the course of pre-indictment investigations, absolute immunity arguably would not apply.  See Buckley, 509 U.S. at 272-276 (holding that prosecutor who fabricates evidence during preliminary investigation and before a determination of probable cause is not absolutely immune); Milstein, 257 F.3d at 1011 (holding that assistant district attorneys who, prior to the existence of probable cause, knowingly obtained false statements from a witness for the purpose of prosecuting the plaintiff were not protected by absolute immunity); Genzler v. Longanbach, 410 F.3d 630, 636-43 (9th Cir. 2005) (holding that a deputy district attorney and investigator were not absolutely immune for coercing or encouraging a witness to lie during police-type investigative work).

evidence that (1) Cervantes and Burt continued their investigation of Plaintiffs despite the fact that they knew or should have known that they were innocent; or (2) Cervantes and Burt used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information.  <u>Devereaux v Abbey</u>, 263 F.3d 1070, 1078 (9th Cir. 2001).

In the First Amended Complaint, Plaintiffs allege that Defendants knew that Plaintiffs were innocent.  (FAC, ¶ 101.)  However, Burt declares that he never believed that Plaintiffs were innocent of the crimes they were charged with.  (Burt Decl. ¶ 10.)   Plaintiffs do not provide any evidence to the contrary.   Plaintiffs have not submitted any declarations declaring actual innocence nor have they pointed to evidence raising a triable issue as to whether Burt or Cervantes knew that they were innocent.

Plaintiffs claim that Defendants knew of a witness, identified as "Samaritan," who saw the shooting of Hartless and who said that Hartless was shot by a Los Angeles gang member.  However,  Burt has produced evidence that the witness identified as "Samaritan" was an unreliable witness who changed her story on numerous occasions and did not, prior to July 5, 2000, provide any information that would exonerate Plaintiffs.  "Samaritan" was first interviewed by police officers on February 19, 1988.  (Burt's Exh. L.)  She indicated that she had heard through other people that Butler had killed Hartless.  (<u>Id.</u>)  In a letter dated July 29, 1988, Butler's counsel acknowledged receipt of the police report regarding the interview of Samaritan.  (Exh. M.)

After the Attorney General's Office took over the case, "Samaritan" was interviewed on a number of other occasions and continually changed her story.  (Bauer Decl. ¶ 4.)  On July 5, 2000, she changed her story by saying that she actually saw the shooting.  (Boyd Decl. ¶ 5.)  On July 24, 2000, she said that the shooter was one of two persons (not Butler) not previously identified by her.  (Boyd Decl. ¶ 6.)  A polygraph analysis indicated deception.  (<u>Id.</u>)

Plaintiffs have not produced any evidence that "Samaritan" identified anyone other than Butler as the shooter while the District Attorney's Office was handling the case.  Indeed,

Plaintiffs largely ignore the Samaritan issue in their opposition briefs.

Based on the evidence before the Court, "Samaritan" did not provide any exculpatory information while the District Attorney's Office was handling the case.  Therefore, Plaintiffs have failed to establish that Burt and Cervantes knew or should have known that they were innocent.

Plaintiffs have also failed to show that Burt or Cervantes knew or should have known that they were procuring false information from Palmer.  Plaintiffs rely heavily on evidence regarding a July 17, 1990 interview of Palmer by Cervantes.  According to Palmer, during this interview, Cervantes told him that Butler's lawyers were going to try to point the finger at him based on the fact that he had a prior criminal history and that .22 caliber bullets like the one that had killed Hartless were found in Palmer's prescription pill bottle.  (Pl.'s Exh. 3 at 8804.) Cervantes also told him that he could face charges based on this evidence.  (Id. at 8805.) Palmer testified that it was clear that Cervantes already had some information about what had happened on the night of the murder and Palmer just went along with Cervantes' information, even though it was incorrect in many respects.  (Id. at 8806, 8810-11.)

Palmer explained:

> I knew when Mr. Cervantes came to talk to me that he had some information or he – wherever he was getting his information from, it wasn't correct.  It wasn't – it wasn't true, and I knew that basically what he was telling me *he knew something about what happened that night*, and I knew that he had talked to the defendants just like I knew that the defendants had talked to the investigators when it first happened before I went and talked to the investigators, so therefore, when I turned myself into the investigators, I was basically going down there to find out what information they really had. . . . Some things he said, *I knew that he had had a little information about what happened*.

(Id. at 8810-11) (emphasis added).

Cervantes brought up the subject of Plaintiffs planning a hit on Rob Dog's people.  (Id. at 8811).  The topic had not been discussed before.  (Id. at 8812).  Cervantes also brought up the subject of Plaintiffs going to the Jack In The Box to look for Rob Dog's people.  (Id. at 8813.)

Palmer testified that the information he confirmed for Cervantes contained a number

12

1   of "non-truths." (Id. at 8822.)  Specifically, Palmer admitted that it was not true that the guns

2   were loaded at Kyle's house.  (Id. at 8809.)  However, there is no evidence that the

3   information regarding the planned hit on Rob Dog's people or the trip to Jack In The Box to

4   look for Rob Dog's people was false.  The Court does not interpret Palmer's testimony as

5   indicating that *all* of Cervantes' information was false, but, rather, that Cervantes knew a little

6   bit about what had actually happened.  Interestingly, when asked whether he and Cervantes

7   had previously discussed the "hit on Rob Dog's people," Palmer responded, "I had spoke

8   with no one else about *what was – took place that night*, no, no."  (Id. at 8812) (emphasis

9   added).[4]

10   More importantly, even if all of the information Palmer confirmed was false, there is

11   no evidence that Cervantes knew or should have know of its falsity.  Palmer did not testify

12   that Cervantes ever indicated that he knew the information he had was false.

13   The investigative techniques used by Cervantes were not so coercive and abusive

14   that he knew or should have known that the techniques would yield false information.

15   During the July 17, 1990 interview and during a subsequent telephone conversation,

16   Cervantes told Palmer that he himself could face charges for the Hartless murder.  (Id. at

17   8805, 8821.)  Cervantes told Palmer that he needed to protect himself.  (Id. at 8821.)  Given

18   that Palmer's gun was used in the murder and bullets for the gun were found in Palmer's

19   prescription pill bottle, Cervantes' warning to Palmer was probably accurate.  Cervantes'

20   message to Palmer was that if he was innocent, he needed to come forward with his side of

21   the story to avoid prosecution.  The Court does not find Cervantes' statements to be

22   coercive.

23   The provision of extraordinary benefits to Palmer, while extremely improper, was not

24   a technique that was so coercive and abusive that Burt and Cervantes knew or should have

25   known that Palmer would *falsify* his testimony.  Burt and Cervantes may very well have

26   _____

27   [4]  At the second trial, Rosendo Garcia and Jermaine Tillis, fellow gang members,
     testified regarding a plan to do a hit on Delano Jones, a member of their rival gang, Rob Dog.

28   (Pl.'s Exh. 1, Report and Recommendation at 44.)  Tillis also testified that in the evening of
     the murder, Plaintiffs, Palmer, Tillis, and "Davis," went to a Jack In The Box on Federal
     Boulevard, a known hangout of the Rob Dog gang to find their intended victim.  (Id.)

provided Palmer with the benefits to secure his truthful testimony against his fellow gang members.   There is simply no evidence that Burt/Cervantes and Palmer entered into an express or implied agreement that Palmer would provide *false* testimony in exchange for the benefits.

Plaintiffs have not shown that there is a genuine issue of material fact with respect to whether Burt and Cervantes deliberately falsified evidence.  Therefore, Burt and Cervantes are entitled to summary judgment on the federal claims.

2. <u>State Claims</u>

a. <u>Immunity</u>

Plaintiffs' state law claims against Burt and Cervantes are based on the same alleged conduct that forms the basis of Plaintiffs' federal law claims.  With the exception of Plaintiffs' false arrest/false imprisonment cause of action, Plaintiffs' state law claims against Burt and Cervantes fail because Burt and Cervantes are immune from state tort liability.

Cal. Gov't Code § 821.6 provides: "A public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause."  Section 821.6 does not apply to suits for false arrest or false imprisonment.  Cal. Gov't Code § 820.4.

Immunity under section 821.6 extends to acts incidental to the investigation of crimes. <u>Amylou R. v. County of Riverside</u>, 28 Cal. App. 4th 1205 (1994).  "Because investigation is 'an essential step' toward the institution of formal proceedings, it 'is also cloaked with immunity.'" <u>Id.</u> at 1210 (quoting <u>Kemmerer v. County of Fresno</u>, 200 Cal. App. 3d 1426, 1436-37 (1988)).

Burt and Cervantes' alleged conduct – i.e., suppression of evidence and falsification of evidence –  was committed in the course of investigating and prosecuting a criminal case.   Therefore, Burt and Cervantes are immune from tort liability for such conduct.

14

1    b. <u>Statute of Limitations - California Tort Claims Act</u>

2         Plaintiffs' state claims are also barred because Plaintiffs failed to file their claims within

3    the time required by the California Tort Claims Act ("CTCA").

4         Before filing suit against a public agency for money or damages due to the death or

5    injury of a person, the injured party must first file a claim with the appropriate public entity

6    within six months after the accrual of the cause of action. Cal. Gov't Code § 911.2. If a claim

7    is rejected as untimely, the claimant may file a written application with the public entity for

8    leave to present the claim.  Cal. Gov't Code § 911.4.  If leave to present a late claim is

9    denied, the claimant may petition the appropriate court (the court that would be proper for

10   the trial of the cause of action to which the claim relates) for an order relieving the claimant

11   from the CTCA's requirements.  Cal. Gov't Code § 946.6.

12        Courts have held that the procedure set forth in section 946.6 is an avenue of relief

13   similar to relief from default and is not designed to resolve the issue of actual compliance

14   with the claim filing requirements. <u>Ngo v. County of Los Angeles</u>, 207 Cal. App. 3d 946, 950

15   (1989).  Therefore, claimants who contend that their claims were in fact timely filed with the

16   public entity may proceed on a complaint which alleges compliance with the claims statute.

17   <u>Id.</u>; <u>Ovando v. Los Angeles</u>, 92 F. Supp. 2d 1011 (C.D. Cal. 2000).

18        Plaintiffs argue that their claims were timely filed or, in the alternative, that Defendants

19   are equitably estopped from raising the time bar.  The Court disagrees.

20        Plaintiffs filed their claims with the County in February, 2001.  (Burt's Exhs. U, W, Y,

21   AA, AC, and AE.)  The claims were promptly rejected as untimely. (Burt's Exhs. V, X, Z, AB,

22   AD, and AF.)

23        Applying California's belated discovery rule, Plaintiffs' claims accrued, *at the latest*,

24   on July 20, 1999, when the California Court of Appeal granted Plaintiffs' joint habeas petition.

25   Under the discovery rule, a plaintiff "discovers" the cause of action when he has reason at

26   least to suspect a factual basis for its elements.  <u>Norgart v. Upjohn Company</u>, 21 Cal. 4th

27   383, 398 (1999).  The plaintiff has reason to suspect when he has notice or information of

28   circumstances to put a reasonable person on inquiry.  <u>Id.</u>  He need not know the specific

facts necessary to establish the cause of action.  Id.   Plaintiffs arguably had reason to suspect a factual basis for their claims as early as March 20, 1997, when the Union Tribune published the article regarding Palmer having sex in the DA's Office.

Plaintiffs argue that they did not know about the suppression of the "Samaritan" evidence until after the plea bargain on August 24, 2000.  However, as discussed above, Plaintiffs have not made any showing that "Samaritan" provided exculpatory information during the District Attorney's handling of the case.  Accordingly, Plaintiffs cannot rely on the "discovery" of evidence regarding "Samaritan" to excuse the untimeliness of their claims.

Plaintiffs also argue that their claims should be considered timely because, under Heck v. Humphrey, 512 U.S. 477 (1994),  their section 1983 claims did not accrue until after the underlying criminal charges were dismissed.  Plaintiffs argue that allowing related state claims to accrue before the section 1983 claims would result in duplicative litigation and would contravene the policy set forth in Heck.   Plaintiffs' argument is not persuasive.  The primary purpose of the CTCA is "to apprise the governmental body of imminent legal action so that it may investigate and evaluate the claim and where appropriate avoid litigation by settling meritorious claims."  Dilts v. Cantua Elementary School Dist., 189 Cal. App. 3d 27, 32 (1987).   This purpose is furthered by filing claims with the public entity as soon as possible, regardless of whether the plaintiff may also have section 1983 claims that would not be ripe until the termination of criminal proceedings.

Plaintiffs contend that under California law, their false arrest/false imprisonment claim did not accrue until they were released on August 24, 2000.  Plaintiffs misconstrue Collins v. County of Los Angeles, 241 Cal. App. 2d 451 (1966), in which the court held that the statute of limitations for false imprisonment begins to run upon the termination of the false imprisonment, not upon termination of the criminal proceedings. Plaintiffs were no longer *falsely* imprisoned after they had been indicted, at which point their false arrest/false imprisonment claims accrued.  Asgari v. City of Los Angeles, 15 Cal. 4th 744 (1997) (holding that once an arrestee is arraigned on formal charges, his confinement is pursuant to a lawful process and no longer constitutes false imprisonment, even if the filing of the charges is

1   based on false information).

2          Finally, Plaintiffs argue that Defendants are equitably estopped from asserting any

3   time bar.  Where the delay in commencing action is induced by the conduct of the defendant

4   it cannot be availed of by him as a defense.  Vu v. Prudential Property & Casualty Ins. Co.,

5   26 Cal. 4th 1142, 1153 (2001).  However, the plaintiffs must act within a reasonable time

6   after the estoppel has ceased to operate.  John R. v. Oakland Unified School Dist., 48 Cal.

7   3d 438, 446 (1989).  See also Santee v. Santa Clara County Off. of Education, 220 Cal. App.

8   3d 702, 716 (1990) (holding that plaintiffs were precluded from relying on estoppel when they

9   still had two months to submit a late-claim application after the circumstances causing delay

10  ceased to operate); DeRose v. Carswell, 196 Cal. App. 3d 1011, 1026 (1987) ("The

11  fundamental problem with DeRose's estoppel argument is that she did nothing to pursue her

12  claims even after Carswell's conduct ceased.")

13         Even assuming Plaintiffs had a legitimate estoppel argument, the circumstances

14  giving rise to estoppel  would have ceased upon the Court of Appeals granting the habeas

15  petitions on July 20, 1999.  Plaintiffs did not file their claims with the County until a year and

16  a half later.  Plaintiffs did not act within a reasonable time and, therefore, cannot rely on

17  estoppel to save their untimely claims.[5]

18  ///

19  ///

20  ///

21  _____

22         [5]  In their opposition papers, Plaintiffs argue that Burt and Cervantes are also being
    sued in their individual capacities for acts outside their scope of employment and that
23  Plaintiffs were not required to comply with the CTCA with respect to these claims.  However,
    the alleged acts that form the basis of Plaintiffs' claims against Burt and Cervantes were
24  committed during the course of their investigation and prosecution of the murder case.
    Accordingly, such acts were within the scope of their employment.  See, e.g., Randle v. City
25  and County of San Francisco, 186 Cal. App. 3d 449, 457 (1986) (holding that alleged
    suppression of evidence by a district attorney and investigating officer was within the scope
26  of their employment).  Moreover, even if Plaintiffs could assert claims against Burt and
    Cervantes for acts outside the scope of their employment, those claims would be barred by
27  the one-year statute of limitations for personal injury actions set forth in the former California
    Code of Civil Procedure section 340.  See Andonagui v. May Dept. Stores Co., 128 Cal. App.
28  4th 435 (2005) (explaining that two-year statute of limitations for personal injuries set forth
    in section 335.1 does not apply retroactively to revive actions that were time-barred by the
    original one-year limitations period at the time the new statute went into effect).

B.     The County

1.  Monell Claim

Plaintiffs seek to hold the County liable for the actions of Burt and Cervantes.  The Court grants summary judgment in favor of the County because Plaintiffs have not shown that they suffered a constitutional deprivation as the result of a municipal policy or custom.  See Monell v. New York City Dep't of Social Services, 436 U.S. 658, 691-93 (1978).

Plaintiffs allege that the San Diego County District Attorney's Office had a custom, policy or practice by which Burt and Cervantes provided sex to the star prosecution witness.  District Attorney Investigator Gouge testified that he once complained to Stan Maddux, presumably a superior, that he had found Palmer sitting at his desk, using his phone, and Palmer's wife  sitting at Marquez's desk.  (Pl.'s Exh. 20 at 5837.)  Gouge also testified that he complained to Maddux that (1) there was little or no security with respect to in-custody informants; (2) informants' families were allowed to visit; (3) informants' children were allowed to run around the office; (4) informants/prisoners were allowed to sit at investigators' desks; and (5) Cervantes, Birse, Peed, and Deddeh held after-hours parties for the informants.  (Id. at 5865.)  Gouge also complained to Burt about security issues concerning in-custody informants.  (Id. at 5866.)   As a result of his complaints, Gouge was told by an unidentified person(s) that he had a "sour grapes" attitude.  (Id. at 5867.)

At best, Plaintiffs' evidence shows that the District Attorney's Office was negligent with respect to the security and handling of in-custody informants and that Cervantes took advantage of the situation by allowing Palmer to have sex in the District Attorney's Office.  Plaintiffs' evidence does not create a triable issue with respect to whether the District Attorney's Office had a custom or practice of (1) allowing informants to have sex in exchange for false testimony; or (2) committing Brady violations by giving informants the undisclosed benefit of sexual encounters.[6]

---

[6]  Prosecutorial immunity does not extend to municipalities sued under section 1983. Lee v. City of Los Angeles, 250 F.3d 668, 680 n. 6 (9th Cir. 2001).

18

2. <u>State Claims</u>

Plaintiffs' state claims against the County fail for the same reasons as discussed above. To the extent that the individual defendants are immune from suit under Cal. Gov't Code § 821.6, the County cannot be held liable. Cal. Gov't Code § 815.2. In addition, the claims are untimely.

C.    <u>Jim Kelly</u>

Plaintiffs allege that Kelly violated their constitutional rights by planting or conspiring to plant the gun evidence. As discussed below, the Court finds that there is a genuine issue of material fact as to whether Kelly planted or conspired with Godine to plant the guns, including the murder weapon.

1. <u>Kelly's Version of Events</u>

At the time of the murders, Kelly was a veteran police detective with the San Diego Police Department. (Pl.'s Exh 3 at 9465; Exh. 12 at 10932.) [7]

According to Kelly, on January 9, 1988, he was at home sleeping when he was awoken by San Diego Police Department Detective David Ayers. (Exh. 3 at 9470; Exh. 12 at 10946-48; Kelly Decl. ¶ 1.) Ayers informed Kelly that an officer had been shot and that Godine was a witness. (<u>Id.</u>) Ayers also told Kelly that Godine had used the false name of Lonnie Gene Fuller, a friend of Godine's who had been killed. (<u>Id.</u>) Kelly agreed that he would try to contact his brother. (<u>Id.</u>)

Kelly called his mother's house, where Godine was sleeping. (Exh. 3 at 9471; Kelly Decl. ¶ 2.) Kelly told Godine to call Detective Ayers and then went back to sleep. (<u>Id.</u>)

In his report, Kelly stated that he went to his mother's house the next morning at 9:30 a.m. (Burt's Exh. I.) When he got to his mother's house, his brother informed him that the guns were under the lemon tree in the backyard of Mrs. Bowlen's house. (<u>Id.</u>) His brother

_____

[7]   Hereinafter, citations to Plaintiffs' exhibits are to the exhibits Plaintiffs filed separately in opposition to Kelly's motion for summary judgment.

01cv2087 BTM(JMA)

1  told him that Butler ran into the house, gave the guns to him, and told him to put them under

2  the lemon tree.  (Id.)

3       At the first trial, Kelly testified that his brother was not at his mother's house when he

4  went there in the morning and that it was his aunt, Louella Holmes, who told him that Godine

5  had taken the guns "out back" after "Stacy" gave him the guns and told him to hide them.

6  (Exh. 3 at 9492, 9497.)  At the second trial, Kelly changed his story again, claiming that his

7  aunt called him while he was still in bed and told him that "Stacy" had given the guns to

8  Godine to hide.  (Exh. 12 at 10967-69.)  In the morning, Kelly drove to his mother's house

9  where he had a heated discussion with Godine.  (Exh. 12 at 11028-39.)

10       Subsequently, Kelly went to the command post at Lincoln High School and informed

11  Sergeant Jerry Alton that the weapons were in the backyard of the house on La Paz.  (Exh.

12  3 at 9492-93; Exh. 12 at 11019.)  He was at the command post for an hour or two.  (Exh. 3

13  at 9498; Exh. 12 at 11001.)  During this time, he did not tell anyone about the information his

14  aunt gave him about "Stacy" giving the guns to Godine.  (Exh. 3 at 9498; Exh. 12 at 11025.)

15

16       Kelly then returned to his mother's house.  (Exh. 3 at 9512; Exh. 12 at 11045.)

17  Godine was at the house.  (Id.)  Kelly reprimanded his brother for his behavior.  (Id.)

18  Afterwards, Kelly and Godine returned to the command post.  (Exh. 3 at 9514; Exh. 12 at

19  11047.)  In his report, Kelly stated that Sergeants Grote and Paradise escorted him to the

20  command post on his first trip to the post because he did not know here it was located.

21  (Burt's Exh. I.)  At the first trial, Kelly changed his story and testified that Grote and Paradise

22  accompanied him on the second trip to the command post.  (Exh. 3 at 9538.)  At the second

23  trial, Kelly changed his story again, testifying that Grote and Paradise escorted him to the

24  command post on the first trip and that he asked Grote and Paradise to escort him because

25  he didn't want to be accused of "doing anything illegal."  (Exh. 12 at 11006, 11061.)

26       When Kelly and Godine arrived at the command post for the second time, Kelly told

27  Lieutenant Nisleit that the weapons were definitely in the backyard of the house on La Paz

28  and that Godine was the person who placed them there.  (Exh. 3 at 9533-34; Burt's Exh. I.)

Agent Horness or Cavanaugh drove Kelly and Godine to 5081 La Paz.  (Exh. 3 at 9534-35; Burt's Exh. I.)  Upon arriving at La Paz, the agent left Kelly and Godine for a few minutes to get the canine units.  (Exh. 3 at 9536.)  The agent returned with Sergeant Payne, another officer, and two dogs.  (Id.)  All of them went into the backyard of 5081 La Paz.  (Id.)  Godine walked directly over to the lemon tree, knelt down, pulled back some grass, and found the guns.  (Id.)

### 2.  The Dog Test

On January 9, 1988, after daybreak, Sergeant Payne and his dog Ingo conducted a search of the backyard of 5081 La Paz.  (Pl.'s Exh. 8 at 10200.)  Ingo was trained to find multiple types of weapons, including buried guns.  (Id. at 10203.)  Payne and Ingo searched the area where the guns were eventually found.  Ingo did not alert that he had found anything in that area.  (Id. at 10207.)   Payne does not know of anything that would have prevented Ingo from finding the weapons.  (Id. at 10209.)

About 30 minutes after Payne completed his search, Officer Mills and his dog Maic conducted a search.  (Id. at 10209.)  Maic was the only dog in the department trained in bomb detection.  (Pl.'s Exh. 4 at 9566.)  Maic was trained to find gunpowder as well as firearms.  (Id. at 9566-68.)  Based on information he had heard over the radio that the weapons were under the lemon tree, Mills and Maic focused their search on the area under the tree.  (Id. at 9571.)  The area under the tree was approximately 10-15 feet in diameter.  (Pl.'s Exh. 7 at 10517.)  After Maic failed to find anything, Mills searched on his hands and knees.  (Id. at 10522.)  Mills feels that it was a thorough search.  (Id.)  After the search yielded no results, Mills and Maic searched the rest of the backyard.  (Id. at 10523.)

About a half-an-hour to an hour later, Agent Cavanaugh told Mills that someone wanted to show him where the guns were.  (Id. at 10524.)  Kelly and Godine led the way into the backyard.  (Id. at 10526.)  Godine came around the lemon tree, pointed down, and said, "there they are." (Id.)  Godine did not move any grass.  (Id. at 10528.) Mills could see one of the guns from where he was standing, approximately five feet away.  (Id. at 10527.)  Mills

1   and Maic searched the area where the guns were found.  (Id. at 10528-29.)

2       At the second trial, Payne testified that after the guns were collected, he conducted

3   a demonstration in the presence of Detective Thill, Officer Mills, and Detective Bourdine.

4   (Pl.'s Ehx. 8 at 10218.)  Payne told Thill that there was a problem with the evidence.  (Id. at

5   10219.)  Payne explained that it was highly unlikely that the dogs would have missed the

6   evidence and asked Thill to hide his service weapon someplace in the yard so that Payne

7   could demonstrate how accurate the dogs were.  (Id. at 10219-20.)  Thill hid his weapon out

8   of sight in the grass near the wooden fence.  (Id. at 10220.)  Ingo found the revolver in less

9   than 30 seconds.  (Id. at 10221.)

10       Detectives Thill and Bourdine corroborated Payne's testimony about the dog test.

11   (Pl.'s Exh. 9 at 10307-13; Pl.'s Exh. 10 at 10329-32.)  Payne told Bourdine that he thought

12   the guns were planted after the dogs had completed their searches.  (Pl.'s Exh. 10 at 10332.)

13   Thill recalls that months after the dog test, there was some discussion in the police

14   department over whether the gun had been planted.  (Pl.'s Exh. 9 at 10313.)

15

16       3.   <u>Analysis</u>

17           a.  <u>Section 1983 Claims</u>

18       There is a constitutional right not to be subjected to criminal charges on the basis of

19   deliberately fabricated evidence.  <u>Devereaux v. Abbey</u>, 263 F.3d 1070, 1074-75 (9th Cir.

20   2001).  The Court finds that there is a genuine issue of material fact as to whether Kelly

21   planted or conspired with Godine to plant the gun evidence.  The guns were crucial evidence

22   that linked Butler and the other members of the Syndo gang to the shooting of Officer

23   Hartless and bolstered Godine's story that Butler gave him the guns and told him to hide

24   them.

25       Although there is no direct evidence that the guns were planted, there is strong

26   circumstantial evidence in this regard.  Two well-trained dogs could not find the guns prior

27   to Kelly and Godine's arrival on the scene.  Godine found the guns without hesitation in the

28   same area where the dogs had previously searched.  The guns were positioned so that at

least one of the guns was visible from five feet away.  The dog test performed by Payne later in the day demonstrated that Ingo could find hidden guns with ease and raised the question whether the guns were under the tree during the prior dog searches.

Furthermore, Kelly had the motive – protecting his brother – and opportunity to plant the gun.  Kelly also behaved like someone who has something to hide:  Kelly did not immediately tell the other officers that "Stacy" had given Godine the guns, admittedly lied in the report he began writing on the afternoon of January 9, 1988, and kept changing his story as to the events of that day. [8]

Kelly argues that Plaintiffs' claims are barred by Heck v. Humphrey, 512 U.S. 477 (1994).  Kelly's argument lacks merit.  Plaintiffs allege misconduct that implies the invalidity of the felony-murder charges and the convictions on those charges.  The felony-murder convictions were overturned.  Plaintiffs' claims do not necessarily imply the invalidity of their subsequent convictions for manslaughter pursuant to voluntary guilty pleas.[9]  Whether the manslaughter convictions impact the damages recoverable by Plaintiffs is a separate question which is not before the Court at this time.

Kelly also argues that Plaintiffs have not produced evidence establishing that he was acting under color of state law.  "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of

---

[8]  Kelly objects to certain trial transcripts submitted by Plaintiffs on the ground that Plaintiffs failed to include the certification of the court reporter.  See Fed. R. Civ. P. 80(c). Kelly correctly points out that Plaintiffs' counsel's declaration that the transcripts are "true and correct copies" is insufficient to authenticate the transcripts.  See Orr v. Bank of America, 285 F.3d 764, 776-77 (9th Cir. 2002).  However, even if the Court does not consider these unauthenticated trial transcripts – i.e., the testimony of Kelly, Mills, and Payne at the first trial – Plaintiffs have raised a genuine issue of material fact as to whether Kelly was involved in planting the gun evidence.

[9]  In Genzler v. Longanbach, 410 F.3d 630 (9th Cir. 2005), Genzler brought a section 1983 suit against a deputy district attorney and investigator, alleging that they engaged in prosecutorial misconduct preceding and during his first trial, which resulted in a conviction for second-degree murder.  Genzler's conviction for second-degree murder was reversed on appeal.  After a second trial, Genzler was convicted of involuntary manslaughter.  In a footnote, the Ninth Circuit explained that Genzler's section 1983 action was not Heck-barred. Id. at 635 n. 1.

1    state law.'" <u>West v. Atkins</u>, 487 U.S. 42, 48 (1988) (quoting <u>United States v. Classic</u>, 313 U.S.

2    299, 326 (1941)).  The acts "must be performed while the officer is acting, purporting, or

3    pretending to act in the performance of his or her official duties."  <u>McDade v. West</u>, 223 F.3d

4    1135, 1140 (9th Cir. 2000).

5        The evidence before the Court shows that Kelly was acting within the scope of his

6    official duties and used his badge of authority in connection with the search for the weapons.

7    Kelly was not acting as an ordinary citizen witness.  After informing officers that the guns

8    were under the lemon tree, Kelly monitored the progress of the search from the command

9    center.  His first visit to the command center lasted up to two hours.  While he was at the

10   command center, he began writing his official report about the events of the day.  More

11   importantly, it appears that Kelly was granted access to the crime scene as a result of his

12   position in the police department.  In addition to being left alone with Godine for a few

13   minutes across from the house at La Paz, Kelly was allowed to lead the way with Godine to

14   the purported location of the guns.

15       In sum, there is a genuine issue of material fact as to whether Kelly planted or

16   conspired with Godine to plant the gun evidence, thereby depriving Plaintiffs of their due

17   process rights.  Accordingly, the Court denies Kelly's motion for summary judgment as to the

18   fifth and seventh causes of action under section 1983.  The Court also denies Kelly's motion

19   for summary judgment as to the section 1983 conspiracy claims (sixth and eighth causes of

20   action) to the extent that the claims allege a conspiracy between Kelly and Godine only.

21   There is no evidence of a conspiracy involving the other defendants.

22

23            b.  <u>Section 1985 and 1986 Claims</u>

24       Plaintiffs' ninth cause of action alleges a conspiracy to obstruct justice in violation of

25   42 U.S.C. § 1985.  Plaintiffs' tenth cause of action alleges neglect to prevent conspiracy in

26   violation of 42 U.S.C. § 1986.  Both of these claims fail because there is no evidence of racial

27   or otherwise discriminatory animus behind the alleged conspirators' actions.

28       Plaintiffs sue under the second clause of section 1985(2), which pertains to

conspiracies where "two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws."

Racial or some other class-based animus is an essential requirement of a claim under the second clause of section 1985(2). Bretz v. Kelman, 773 F.2d 1026,1029 (9th Cir. 1985). "To establish racial or class-based animus, a plaintiff must show 'invidiously discriminatory motivation . . . behind the conspirators' action.'" Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987) (quoting Griffin v. Breckenridge, 403 U.S. 88, 102 (1971)). Although there is a triable issue as to whether Kelly and Godine conspired to plant the gun evidence, there is no evidence that their actions were motivated by any sort of discriminatory animus. Plaintiffs' theory that Defendants attempted to frame Plaintiffs because they were black and the fleeing suspect was black is entirely speculative and, at any rate, does not support a finding of invidious discriminatory motivation

Accordingly, the Court grants summary judgment in favor of Kelly on Plaintiffs' section 1985 claim. For the same reasons, the Court also grants summary judgment in favor of Kelly on Plaintiffs' section 1986 claim. See Karim-Panahi v. Los Angeles Police Dept., 839 F.2d 621, 626 (9th Cir. 1988) (explaining that a claim can be stated under section 1986 only if the complaint contains a valid claim under section 1985).

### c. State Law Claims

Plaintiffs' state law claims are barred because they were not filed with the City within the six-month period prescribed by the CTCA.

Plaintiffs filed their claims with the City in February 2001. (Decl. of Leroy Hostetler, Exhs. A-F.) The claims were rejected as untimely. (Decl. of Gini Sokol, Exh. G.)

Plaintiffs' state law claims against Kelly accrued, at the latest, after the dog test evidence came out at the second trial. Although the statute of limitations for Plaintiffs' state

1   claims would have been tolled during the time that the charges were still pending against

2   them, Plaintiffs were not excused from filing their claims with the City within the six-month

3   period.  McMartin v. Los Angeles, 202 Cal. App. 3d 848 (1988); Cal. Gov't Code § 945.3.

4   Plaintiffs' equitable estoppel and Heck arguments fail for the same reasons as discussed in

5   Section II.A.2.b., supra.

6        Plaintiffs contend that Kelly is also being sued in his individual capacity for acts

7   outside the scope of his employment.  However, as previously discussed, Kelly was acting

8   or purporting to act in the performance of his official duties. See Meester v. Davies, 11 Cal.

9   App. 3d 342 (1970) (holding that policemen who allegedly conspired with others to falsely

10  accuse plaintiff of criminal acts were acting within the scope of their official authority or

11  power, and plaintiff was required to comply with the CTCA's filing requirements).  Therefore,

12  Plaintiffs' claims were subject to the CTCA.

13       Plaintiffs failed to comply with the filing requirements of the CTCA.  Therefore, their

14  state law claims against Kelly are barred, and the Court grants summary judgment in favor

15  of Kelly on such claims.

16

17  D.  The City of San Diego

18       1.  Monell Claims

19       Plaintiffs claim that Kelly acted pursuant to the City's unwritten practice of permitting

20  and/or concealing the planting of evidence.  However, Plaintiffs' evidence falls short of raising

21  a genuine issue of material fact with respect to whether such a policy or custom exists.

22       Plaintiff relies on evidence that official reports left out information regarding the "dog

23  test" and left out details that would raise suspicion of evidence planting.  For example, the

24  "dog test" was not documented by Payne, who performed the test, or Bourdine or Thill, who

25  were present during the test.  (Pl.'s Exh. 8 at 10222; Exh. 10 at 10338.)  Officer Cavanaugh

26  heard about the "dog test" but did not document it anywhere.  (Pl.'s Exh. 6 at 10639-41.)

27  Mills' report did not specifically say that he had information that the guns were under the

28  lemon tree and that he and Maic were unable to find them.  (Pl.'s Exh. 4 at 9592.)

The fact that these officers failed to include in their reports information that would support the theory that the guns were planted is not evidence of a practice or custom of permitting or concealing the planting of evidence.  A municipal policy or custom can be shown in the following three ways: (1) by showing a longstanding practice or custom which constitutes the "standard operating procedure" of the local entity; (2) by showing that the decision-making official was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision; or (3) by showing that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate.  Menotti v. City of Seattle, 409 F.3d 1113, 1147 (9th Cir. 2005).  A municipal policy "may be inferred from widespread practices or evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded."  Id.  (quoting Nadell v. Las Vegas Metro. Police Dept., 268 F.3d 924, 929 (9th Cir. 2001)).

Plaintiffs' evidence that a few officers failed to include significant information in their reports does not establish that there was a widespread or longstanding practice of concealing or turning a blind eye to the planting of evidence.  Plaintiffs have also failed to show that an official with final policymaking authority ratified  the actions of Kelly or the omissions of Payne and the other officers.  Payne did not tell his commander about the dog test until the day before he testified at the second trial.  (Pl.'s Exh. 8 at 10223.)  Payne denied ever telling anybody high up in the police department about the dog test.  (Id.)

Due to the absence of evidence that Kelly's conduct was a product of City policy or custom, the Court grants summary judgment in favor of the City on Plaintiffs' federal claims. The Court also grants summary judgment in favor of the City on Plaintiffs' section 1985 and 1986 claims for the reasons discussed in Section II.C.3.b., supra.

2. State Claims

Plaintiffs' state claims against the City are barred for failure to present the claims within the time required by the CTCA.  Accordingly, the Court grants summary judgment in

27

01cv2087 BTM(JMA)

1   favor of the City on Plaintiffs' state claims.

2

3   E.  <u>Palmer and Godine</u>

4          It appears that Plaintiffs have not yet served Palmer or Godine with the summons and

5   First Amended Complaint.  Accordingly, the Court issues an order to show cause why this

6   case should not be dismissed as to Godine for failure to serve the summons and complaint

7   within 120 days after the filing of the complaint as required by Fed. R. Civ. P. 4(m).

8          If Plaintiffs had served Palmer, the Court would have granted judgment in favor of

9   Palmer.  Palmer would be entitled to judgment on the federal claims because there is no

10   evidence of a conspiracy with state actors to deliberately fabricate evidence.  The state

11   claims would be barred under the former one-year statute of limitations for personal injury.

12   Therefore, instead of issuing an order to show cause as to Palmer, the Court dismisses all

13   claims against Palmer with prejudice.

14

15                              **III.  <u>CONCLUSION</u>**

16          For the reasons discussed above, the motion for summary judgment filed by Burt and

17   the County defendants **[194-1; 194-2]** is **GRANTED**.  Cervantes' motion for summary

18   judgment **[213-1;213-2]** is also **GRANTED**.  The motion for summary judgment filed by Kelly

19   and the City of San Diego **[208-1]** is **GRANTED IN PART AND DENIED IN PART**.  The

20   motion is **GRANTED** as to all of the claims against the City and as to the first, second, third,

21   fourth, ninth, tenth, seventeenth, eighteenth, nineteenth, twentieth, and twenty-first causes

22   of action against Kelly.  The motion is **DENIED** as to the fifth, sixth, seventh, and eighth

23   causes of action against Kelly.  The conspiracy claims in the sixth and eighth causes of

24   action are limited to claims of conspiracy between Kelly and Godine only.

25          Judgment shall be entered against Plaintiffs and in favor of the following defendants:

26   Keith Burt, Edward Cervantes, the County of San Diego, the San Diego District Attorney's

27   Office, the City of San Diego, and the San Diego Police Department.

28          Plaintiffs' claims against Palmer are **DISMISSED WITH PREJUDICE**.

1    Furthermore, the Court **ORDERS PLAINTIFFS TO SHOW CAUSE** why this case

2    should not be dismissed as to Godine for failure to serve the summons and complaint within

3    120 days after the filing of the complaint as required by Fed. R. Civ. P. 4(m).  The hearing

4    on the OSC shall take place on November 27, 2006 at 4:30 p.m.  Any papers submitted in

5    support or opposition to the OSC shall be filed on or before November 14, 2006.

6    The pretrial conference shall take place on January 23, 2007 at 4:30 p.m.  The

7    proposed pretrial order shall be lodged with Chambers on or before January 16, 2007.

8    Pretrial disclosures shall be completed on or before January 2, 2007.

9

10   **IT IS SO ORDERED.**

11

12   DATED:  October 25, 2006

13

14   Hon. Barry Ted Moskowitz
     United States District Judge